BROLASKI, Respondent, v. CARR, Appellant.

St. Louis Court of Appeals, November 5, 1907.

1. **FRAUDULENT REPRESENTATIONS: Duty of Investigation.** One party about to trade with another has a right to rely upon the representations of the other, made with knowledge, and it does not require investigation by the party to whom they are made to ascertain whether they are true or false; in such case if one party is induced to trade through false representations of the other, he has a right to a rescission.

2. **EQUITY: Appellate Practice: Review of Chancellor's Findings.** Where the evidence is evenly balanced in an equity proceeding, the finding of the chancellor who has the witnesses before him will be deferred to by the appellate court.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*David Murphy* for appellants.

The burden is on plaintiff to prove that the representations were made, that they were false, and that he acted on the faith of them. Anderson v. McPike, 86

Mo. 293; Tinker v. Kier, 195 Mo. 183. "There must be a preponderance of evidence—a preponderance is sufficient." Marshall v. Insurance Co., 43 Mo. 586; Rothschild v. Insurance Co., 62 Mo. 356; Hitcjcock v. Baughn, 36 Mo. App. 216. "The proof must produce satisfactory conviction." Bryan v. Huckworth, 43 Mo. 527. "Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which the inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. The presumption is, that if a party affected by any fraudulent transaction might with ordinary care and attention have seasonably detected it, he seasonably had knowledge of it . . . and if he had the means of discovery in his power, he will be held to have known it." Wood v. Carpenter, 101 U. S. 135; Shelby Co. v. Bragg, 135 Mo. 291.

*Albert C. Davis* for respondent.

(1)   Where the testimony is oral and there is a conflict in the evidence and the witnesses were before the chancellor, the appellate court will defer to the findings of the chancellor. Tinker v. Kier, 195 Mo. 203; Carter v. Dilley, 167 Mo. 564; Dunivan v. Dunivan, 157 Mo. 157; Chance v. Jennings, 159 Mo. 544; Culver v. Smith, 82 Mo. App. 290; Berry v. Hartzel, 91 Mo. 138; Springer v. Kleinsorge, 83 Mo. 159; Mathias v. O'Neil, 94 Mo. 520. (2)   No duty rested upon respondent to make inquiry. One to whom a particular and distinct representation has been made is entitled to rely upon the representation, and need not make any further inquiry, especially where an investigation would be required to discover the truth. Pomeroy v. Benton, 57 Mo. 531; Wannell v. Kem, 57 Mo. 478; Foley v. Holtry, 43 Neb. 133; Olcutt v. Bolton, 50 Neb. 779; Caldwell v. Henry, 76 Mo. 254; Hess v. Draffen, 99 Mo. App. 587; Alexander v. Wade, 107 Mo. App. 327; Cottrill v. Krum, 100 Mo. 404; Richards v. Lee, 71 Mo. App. 230; Judd v. Walker, 114 Mo. App. 128.

BLAND, P. J.—Omitting caption and signatures the petition is as follows:

"Plaintiff for cause of action states that the defendant is a corporation duly organized and existing under and by virtue of the laws of the State of Missouri, and that the defendant John Frank Carr was at the time and times hereinafter mentioned and now is president thereof.

"Plaintiff further alleges that said corporation is organized for the purpose of manufacturing a gate or gates for the purpose of starting horses to run on race tracks throughout the United States.

"Plaintiff further states that heretofore, to-wit, on or about the twenty-third of September, 1903, the said John Frank Carr, for himself or acting for and representing said company, but whether he was so acting as the representative of said company or for and in his individual behalf and capacity, plaintiff does not know, for the purpose of inducing plaintiff to purchase shares of stock in said corporation, represented to H. Brolaski, acting then and there as the agent of plaintiff, that said corporation was a full paid-up corporation in currency of the United States, in the sum of $30,000; that one C. A. P. Tilles, an influential and moneyed man, was a large stockholder in said company; that the plan and device owned by said company for starting horses as aforesaid had been tested, and found to be a success, and that said corporation had contracts in the city of St. Louis and Hot Springs, Arkansas, for the erection, maintenance and operating of said gates, whereby the said company would receive large sums of money; that said company was in a solvent and thriving condition.

"Plaintiff further states that the defendant John Frank Carr further represented to her that the stock so about to be sold was the stock of the company, and was sold by the company to plaintiff, and that the money to be derived from said sale was to be used by said com-

pany, and not for the individual benefit of the said John Frank Carr.

"Plaintiff further alleges that each and every one of said above representations were false and fraudulently made by the said John Frank Carr, for the purpose of fraudulently inducing plaintiff to purchase ten shares of stock in said company for the sum of one hundred dollars each, or a total sum of one thousand dollars, and when so made were well known by said Carr to be false.

"That the plaintiff relying upon said representations purchased of the defendant John Frank Carr, ten shares of stock for the sum of one hundred dollars each, and plaintiff alleges that said stock was the stock of the said defendant John Frank Carr or the stock of the defendant company, and that the said John Frank Carr was acting for himself when he made said representations to plaintiff as aforesaid, and sold said stock to plaintiff, or was acting in his capacity as representative of the defendant company, and plaintiff states that she is ignorant whether the former or latter is true; that said stock is utterly worthless, and that said right to make and sell the said electric horse starting gate is also worthless. That said company has no valuable assets, but on the contrary its entire assets are worthless.

"Plaintiff herewith files said ten shares of stock in the defendant company and offers and tenders the same to defendants.

"Wherefore, by reason of the premises, plaintiff asks that said contract be held to be false, fraudulent and void, and that the defendants be required to return to her the said sum of one thousand dollars so paid by her to him for it, and for costs."

The answer is as follows:

"The defendants by their attorney, for answer to plaintiff's petition, admits that the defendant Carr Electrical Horse Starting Machine Co., is a corporation as

alleged, and that defendant John Frank Carr is president thereof, and that said corporation is organized for the purpose of manufacturing a gate or gates for the purpose of starting horses to run races on race tracks throughout the United States. And further answering both defendants deny each and every other alleged cause of action in plaintiff's petition set forth.

"And having fully answered, defendants pray to be discharged with their costs."

The court found the ten shares of stock sold to plaintiff was the individual property of Carr, and that the sale was fraudulent, cancelled the sale and, on a tender of the stock to Carr, rendered judgment against him for one thousand dollars from which he appealed. Carr had secured letters patent on the device named in the petition, from the government of the United States and from the governments of other countries. At the date of the formation of the corporation, he also had some machinery and leases on shops fitted up to manufacture the device, all of which he transferred to the corporation. The capital stock of the company was $30,-000. The original subscribers for the stock are as follows:

| Name. | Residence. | No. of Shares. |
|---|---|---|
| John F. Carr, | St. Louis, Missouri, | 260 |
| Daniel J. Waugh, | St. Louis, Missouri, | 10 |
| W. H. Wiedmer, | St. Louis, Missouri, | 10 |
| Frederick Wiedmer, | St. Louis, Missouri, | 10 |
| John F. Gilbride, | St. Louis, Missouri, | 10 |

One-half the stock was paid up in the following manner: Carr had $15,000 in bank, against this deposit he drew four checks for $1,000 each, in favor of each of the other four incorporators. These incorporators deposited these checks in bank, and then drew their separate checks in favor of the corporation for the same amount. Carr then drew his check for the balance of the $15,000,

in favor of the corporation, and in this manner Carr's deposit of $15,000 was transferred from his account to the credit of the corporation. A few days after the incorporation was perfected, the board of directors, by unanimous vote, bought for and in the name of the corporation, all of Carr's patents, machinery and leases on shops for the sum of $15,000 and in this manner Carr became repossessed of the original $15,000, and the corporation was left with patents, machinery and shops but had no cash. The incorporators other than Carr took and paid Carr for one share of stock each, leaving him the holder of 296 shares. Ten of these shares he sold to plaintiff for $1,000; ten others he sold to another person for the same sum. He made one of the starting gates or machines, mentioned in the petition, which was tested on several race tracks near the city of St. Louis in 1904, and was used on one of these tracks in regular competing horse races for a prize; and the testimony tends to show the device was eminently successful in protecting the horses on the start and in securing a fair and even start, but since 1904 the machine has not been operated upon any race track at any place. Why it has not been introduced where horse racing is permitted by law is not explained in the evidence.

Plaintiff's evidence tends to show that Harry Brolaski, her son, was her general business agent, and her agent to make the purchase of stock in the corporation. He testified Carr told him that, "This starting company had been organized and incorporated for thirty thousand dollars paid up, and that almost all the shares had been sold, probably fifteen or twenty left, and he went on to tell me what contracts he had; that he had tested the machine, and the contracts that he had at Hot Springs and St. Louis for this starting machine. He said he had the Hot Springs Jockey Club. I think it had been organized; that Jeffery was president, and Mr. Sidener, I think, was interested in the same jockey club. He

also spoke of the Kinloch Club. He said C. A. P. Tilles was one of the largest stockholders in this starting company." Witness testified he communicated these representations to his mother, whereupon she told him to buy the stock and, relying upon the truth of the representations, he made the purchase for his mother. As a matter of fact the company had no contracts with the racing association of St. Louis, Hot Springs, or elsewhere, for the use of the machine. Mr. Tilles, whom the testimony shows to be a very rich man and largely interested in racing, at no time had any stock in the corporation. In respect to the transaction, Carr testified: "I went to Mr. Brolaski and I asked him if he wouldn't become interested in the machine; that I understood he had control of the Kinloch track and I thought, if they wouldn't put it on the Fair Grounds track, I could get him interested and have him put it on at the Kinloch track, to get the machine in operation; and he thought very well of the machine. He said everybody talked fairly well of it, and he said he would take some of the stock. I said I only wanted to sell enough to build a new machine; that was twenty shares. I sold Hall ten and Mr. Brolaski ten." Witness also testified that at the time of the sale he controlled the whole stock of the corporation; so it appears there is a very sharp conflict in the evidence as to what representations were made, if any, by Carr to Brolaski at the time of the sale and purchase of the stock. Brolaski made no investigation of the books of the corporation and did not ask to see the stock book. He testified Carr told him the contracts with various racing associations for the use of the machine on their race tracks were locked up in a safe deposit box, and that he did not ask him to produce them. Carr's evidence shows he was the owner of all the stock in the company but four shares, at the time he made the sale to plaintiff, and was also president of the company and its sole manager, consequently he knew all about its

financial condition. Therefore, if he made the representations to Brolaski the latter testified he made, he did so knowing them to be false. But it is contended by defendant that plaintiff is not entitled to relief, for the reason neither she or her agent made any investigation of the affairs of the company and bought "with their eyes shut." To have discovered the financial condition of the corporation would have required an examination of all its books and all its physical assets. In such circumstances, the rule is, "If a representation is made to another person going to deal in a matter of interest upon the faith of that representation, the former shall make that representation good, if he knows it to be false." [Story's Eq. Jur., sec. 191; Langdon v. Green, 49 Mo. 363; Bryan v. Hitchcock, 43 Mo. 527.] Kerr says: "No man can complain that another has relied too implicitly on the truth of what he himself stated." [Kerr on Fraud, p. 81.] And in the case of Cottrill v. Krum, 100 Mo. 397, 13 S. W. 753, the court ruled: "In an action for false representations, charged to have been made by defendant, as to the value of corporate stock exchanged for real estate, it is error to instruct the jury that if plaintiff, by diligent inquiry, might have ascertained the falsity of the alleged representations, and failed to investigate the same, then he could not recover." When to discover the wrong investigation is necessary, a party is not bound to make the investigation but may rely on representations made to him by the other party. [Pomeroy v. Benton, 57 Mo. 531; Judd v. Walker, 114 Mo. App. 128, 89 S. W. 558; Alexander v. Wade, 107 Mo. App. 321, 80 S. W. 917; Cottrill v. Krum, supra.]

It is further contended that the preponderance of the evidence was not in plaintiff's favor; that the evidence of H. M. Brolaski, plaintiff's agent asserts the existence of fraud, and that Carr's evidence denies all existence of fraud, and that neither is corroborated by any other evidence in the case, and there is nothing to

show that one is more credible than the other; that for these reasons the judgment should be reversed. The naked fact that plaintiff bought the stock and paid par for it, in utter ignorance of the financial condition of the company, is some corroboration of the evidence of H. M. Brolaski, but even if there were no facts or circumstances in the case to corroborate his evidence and the case stood alone upon his affirmance of fraud by him and Carr's denial of it, we would defer to the finding of the chancellor, for the reason he was in a much more favorable position to wisely determine the preponderance of the evidence than are we. [Carter v. Dilly, 167 Mo. l. c. 571, 67 S. W. 232.] As was said in Tinker v. Kier, 195 Mo. l. c. 203, 94 S. W. 501: "It is only where the result is manifestly wrong that this court will set aside the finding of facts of the trial court, in equity cases." It is not manifest that the result reached in the trial court was wrong, and we affirm the judgment. All concur.