## JOHN A. SNIDER, Respondent, v. S. M. McATEE, Executor, Appellant.

St. Louis Court of Appeals, May 7, 1912.

1. **WITNESSES: Competency: Separate Contracts Made with Decedent About Same Subject-Matter: Competency of Contracting Parties.** In an action against an executor for fraudulent misrepresentations alleged to have been made by his testate concerning the sale of corporate stock, where it appeared that plaintiff and two others purchased stock from decedent, and, although all were together at the time of the purchase, decedent dealt with each one individually and each acted and contracted for himself, such two other purchasers were not incompetent to testify for plaintiff, under section 6354, Revised Statutes 1909, providing that, where one party to a contract in issue is dead, the other party may not testify in his own favor, or in favor of any other party to the action claiming under him. *Held,* by REYNOLDS, P. J., dissenting, that the facts disclosed by the record are as follows: Decedent, the cashier of a bank, was indebted to the bank. In order to raise funds to discharge this indebtedness, he proposed to sell to three directors of the bank sixty-five shares of the capital stock of the bank, evidenced by two certificates for forty and twenty-five shares, respectively, at the price of $150 per share. This proposition was accepted; one of the purchasers receiving twenty, one twenty-two and the other twenty-three shares. After the purchase, it was discovered that the stock was not worth the amount paid for it, on account of the financial condition of the bank, and thereupon the purchasers claimed the seller promised, in order to make good his representations concerning the value of the stock, to repay them fifty dollars per share. One of the purchasers brought suit on this promise against the executor of the seller, and offered, at the trial, one of the other purchasers as a witness to prove it, and objection was made by defendant to his competency as a witness, under section 6354, Revised Statutes 1909. On these facts, *held,* in the dissenting opinion, that the witness was a "party to the contract in issue," was "testifying in his own favor," and was, therefore, incompetent under the statute, since the sale of the stock was one entire transaction, made for the purpose of enabling decedent to adjust his financial obligations to the bank, and the alleged promise to refund was likewise made with the purchasers acting collectively.

2. **TRIAL PRACTICE: Appeal from Probate Court: Binding Effect of Theory at Trial: Pleading.** Although a demand, filed in the probate court against the estate of a decedent, should be sufficiently definite to inform the adverse party what he must defend against, yet where the statement is defective as to a certain issue but such issue has been contested and tried, without objection, as if it were made by the pleadings, it will be treated, on appeal, as within the pleadings.

3. **FRAUD AND DECEIT: Misrepresentations: Reckless Statements.** Where the cashier of a bank, in selling stock owned by him, represented that the bank had sufficient surplus and undivided profits to make the stock worth $150 a share, when, in fact, it was worth only $100 a share, he was liable for the false representations, whether he knew they were false or not, since, where a person, making false representations as of his own knowldge and asserting them to be true, has no knowledge whatever on the subject, or possesses special means of knowledge and ought to know that the representations are false, the law implies scienter.

4. **———: ———: Subject-Matter Equally Known to Both Parties.** Neither the law nor equity will afford relief for false representations, where the subject-matter of dispute is equally known to both parties; and if one trusts to representations that are not calculated to impose upon a person of ordinary prudence, or neglects means of information within easy reach, he should suffer the consequences.

5. **———: ———: Duty to Investigate: Degree of Diligence Required.** Where a director and vice president of a bank, having no actual knowledge of a shortage in its accounts, and no means of ascertaining such fact without an extended examination of its books, purchased from its cashier, who had complete charge of its deposits, books, and accounts, certain shares of its capital stock, owned by the latter, in reliance on his false representations as to its condition, he was not estopped from recovering from such cashier, in an action based upon the latter's fraudulent misrepresentations, on the ground that he was negligent in not knowing the true condition of the bank's affairs, since, although he could not, in reliance on such representations, neglect means of information within easy reach, he was not bound to exercise extraordinary diligence to obtain it.

Appeal from Cape Girardeau Circuit Court.—*Hon. Henry C. Riley*, Judge.

AFFIRMED. CERTIFED TO SUPREME COURT.

*Albert M. Spradling* and *T. D. Hines* for appellant.

(1) When one of the original parties to the contract or cause of action in issue and on trial is dead, the other party to such contract or cause of action shall not be permitted to testify in his own favor or in favor of any one claiming under him. Angell v. Hester, 64 Mo. 142; Ring v. Jamison, 66 Mo. 424; Meier v. Thieman, 90 Mo. 433; Messimer v. McCray, 113 Mo. 382; Weiermueller v. Scullin, 203 Mo. 466; Griffin v. Nicholas, 224 Mo. 275. (2) The board of directors of a bank have a general superintendence over and management of all its business affairs and are bound to know all that is done, and what they ought to know as to the general course of the bank's business, they will be presumed to know. Morse on Banks and Banking (3 Ed.), sec. 116; Bank v. Hill, 148 Mo. 380; Martin v. Webb, 110 U. S. 15; Hun v. Cary, 82 N. Y. 71. (3) The law requires every man, in the possession of his intellectual faculties, to use them for his own protection and not to depend upon the courts to act as a standing guardian over his own carelessness, improvidence or credulity. Cahn v. Reid, 18 Mo. App. 127; Mires v. Summerville, 85 Mo. App. 183; Shearer & Martin v. Hill, 125 Mo. App. 375; Hendricks v. Vivion, 118 Mo. App. 417; Bradford v. Wright, 145 Mo. App. 623; Hines v. Boyce, 127 Mo. App. 718; Funding & Foundry Co. v. Heskett, 125 Mo. App. 516; Davis v. Ins. Co., 81 Mo. App. 264. (4) To be entitled to rescind a contract on the ground of fraudulent representation, the vendee must prove that false representations of material facts were made to him with the intent to deceive; that he believed them to be true; that his reliance on them was an act of ordinary prudence; and that they influenced his action. Wannell v. Kem, 57 Mo. 478; Lovelace v. Sutor, 93 Mo. App. 429; Funding Co. v. Heskett, 125 Mo. App. 516; Phelps v. Jones, 141 Mo. App. 223. (5) A promise made subsequent to the main contract and without a new con-

sideration to support it is without consideration and cannot be enforced. Lamp Co. v. Mfg. Co., 64 Mo. App. 115; Wollman v. Loemen, 96 Mo. App. 299; Riley v. Stevenson, 118 Mo. App. 187; Lumber Co. v. Stoddard Co., 131 Mo. App. 15; Glenn v. Hill, 210 Mo. 291.

*John A. Snider* and *Oliver & Oliver* for respondent.

(1) Where one makes, as of his own knowledge, a false representation, not knowing whether it is true or false and it is relied upon, it is fraud as much as if he knew it to be false. It is the effect, not the corrupt motive, the law looks at and denounces as fraud. Leach v. Bond, 129 Mo. App. 315; Hamlin v. Abell, 120 Mo. App. 188; Nauman v. Oberle, 90 Mo. App. 666; Caldwell v. Henry, 76 Mo. App. 254; Walsh v. Morse, 80 Mo. App. 568. (2) Scienter was fully established in every one of the three ways in which it may arise: First, Quinn being cashier of the bank, made the false representation with the knowledge that it was false; second, where a party represents something to be true, as of his own knowledge, when he has no knowledge as to whether it is true or false, 'and it is in fact untrue; third, where the party by reason of his peculiar position has "special means of knowledge" and makes representations which he ought to have known to be false, if he did not. Serrano v. Commission Co., 117 Mo. App. 194; Bank v. Byers, 139 Mo. 627; Hamlin v. Abell, 120 Mo. 188, Raley v. Williams, 73 Mo. 310. (3) A plaintiff in an action to recover a claim against an estate is a competent witness in reference to conversations with him in regard to the matter in controversy after the death of the deceased. More v. Renick, 95 Mo. App. 202. The statute relating to one party testifying when the other is dead, limits its prohibition to the liv-

ing party testifying in his own favor or the favor of his assignee, nor does the statute disqualify the living party as a witness concerning things about which he has no interest even though the other party is dead. Thompson & Thompson v. Brown, 121 Mo. App. 524. (4) The natural presumption is, that one not a party to the suit is not a party in interest, and where there is direct testimony supporting that presumption and only inferential testimony hinting at a different state of facts, the presumption so supported must obtain. On the assumption that the witness Sperling was interested in this suit of John A. Snider v. Estate of Quinn, the law is that an interest in the result does not exclude the witness or affect his competency. It may affect his credibility. R. S. 1899, sec. 4652; Looker v. Davis, 47 Mo. 140; Poe v. Domich, 54 Mo. 119; Klosterman v. Loos, 58 Mo. 290; Angell v. Hester, 64 Mo. 142; Reed v. Painter, 145 Mo. 353; Jackson v. Smith, 139 Mo. App. 691. (5) Interest as a disqualification is totally abolished by the first clause of section 4652, Revised Statutes 1899, and it is not restored by the proviso. Jackson v. Smith, 139 Mo. App. 691; Weiermueller v. Scullin, 203 Mo. 466. (6) A declaration against one's interest or admissions of the existence of an obligation are admissible, even though declarant be since deceased, is elementary. 2 Wigmore on Evidence, sec. 1456; Wynn v. Corey, 48 Mo. 346; Moore v. Rennick, 95 Mo. App. 202; Jones v. Thomas, 218 Mo. 543.

NORTONI, J.—This proceeding originated in the probate court and involves the allowance of a demand against the estate of Hugh R. Quinn, deceased, arising out of the sale of twenty-two shares of bank stock by Quinn to plaintiff. The finding and judgment were for plaintiff in both the probate and circuit court, to which the case was taken on appeal, and from the judgment of the latter court defendant appeals here.

It appears that Hugh R. Quinn in his lifetime owned considerable stock in the Exchange Bank of Jackson, Missouri, and was its cashier. About sixteen months before plaintiff purchased the twenty-two shares of stock from Quinn, he was elected a director of the bank and was vice president thereof on the date of the purchase. Quinn, desiring to sell sixty-five shares of the stock owned by him, submitted a proposition to plaintiff, B. S. Schwab and Blucher Sperling to that effect. After considering the matter, plaintiff purchased twenty-two shares of the stock at $150 a share. Mr. Sperling purchased twenty-three of the shares and Mr. Schwab the remainder, all at the same price. Mr. Quinn having subsequently died, plaintiff filed the demand involved here for $1100, or fifty dollars per share, against his estate, by which he seeks to recover this amount and interest thereon, on the theory that, through misrepresentation, Quinn induced him to pay fifty dollars per share more than the stock was worth at the time of purchase. When the contract of purchase was entered into, plaintiff, Sperling and Schwab were present and negotiated with defendant concerning the sale of stock to each. Sperling was introduced as a witness for plaintiff and gave testimony tending to support his claim. Indeed, Sperling is the only witness who testified in the cause and his evidence stands uncontroverted in the record.

The first point urged for a reversal of the judgment goes to the effect that, in view of the subsequent death of Quinn, Sperling was an incompetent witness, for it is said there was but one contract made between Quinn, Sperling and Schwab for the sale of the stock and that they subsequently divided it. The record by no means justifies this conclusion. Indeed, the evidence is plain and positive to the contrary. Sperling testifies that all three of the parties purchased the stock at the same time from Mr. Quinn on September 4th and that each purchaser paid $150 per share for the

stock so purchased. It is true that all the parties were together at the time, and negotiated the contract of purchase with Quinn, but it appears beyond question that each acted for himself. While Mr. Quinn sold the sixty-five shares of stock at the same time to the three purchasers mentioned, he dealt with each individually in so doing, for it conclusively appears that each party purchased directly from him on his own individual account and paid the purchase price. In other words, plaintiff and Schwab and Sperling did not jointly purchase the stock from Quinn and afterwards divide it among themselves but each then and there purchased for himself. The statute (Sec. 6354, R. S. 1909) provides that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or of any other party to the action claiming under him. The inhibition above quoted is without influence here, for the witness Sperling is in no sense a party to plaintiff's cause of action or to the contract by which plaintiff acquired title to the twenty-two shares of stock which he purchased. Plaintiff did not acquire title through Sperling or through any contract by which they jointly purchased the stock, for each party individually purchased from Quinn and paid for a certain number of shares of stock. Neither is plaintiff's right derived in any sense through Sperling, the witness, but on the contrary it arises from his individual contract of purchase entered into with Quinn in the presence of Sperling and Schwab. Obviously the witness Sperling was competent to speak of the contract made in his presence by plaintiff and Quinn. [See Thompson v. Brown, 121 Mo. App. 524, 97 S. W. 242.]

The issue tried in the circuit court and on which plaintiff recovered pertained to a misrepresentation on the part of Quinn touching the value of the bank stock,

. and it is argued here the judgment should be reversed for the reason the pleading is insufficient on that score. It is true plaintiff's demand filed in the probate court is defective in the respect mentioned, but it seems that no question was made touching the matter at the trial. The statute (Sec. 206, R. S. 1909) provides that the probate court shall hear and determine all demands filed against an estate in a summary way without the form of pleading. But it is said such demands shall be sufficiently definite to inform the adverse party of what he must defend against. [Watkins v. Donnelly, 88 Mo. 322.] However, when it appears the parties have contested and tried out the issue as though it were made by the pleadings and this, too, without any objection whatever, the appellate court should treat with and dispose of the case on the same theory as that voluntarily adopted at the trial. All of the evidence pertaining to the misrepresentations about the value of the stock and the condition of the bank was received without objection and, furthermore, much of this defendant elicited by his own examination. Such was the issue clearly made and tried by the parties on the informal statement of demand originally filed in the probate court and it is obvious that both came prepared to meet the particular issue on which the recovery was had. In such circumstances, it would be highly unjust for the appellate court to reverse the judgment and remand the cause for amendment, to the end that the identical issue, tried once without objection, should be tried a second time. Instead of so doing, the rule of decision is, that the court will, in the interests of justice, treat the matter as within the pleadings. [Litton v. C. B. & Q. R. Co., 111 Mo. App. 140, 85 S. W. 978; Mellor v. Mo. Pac. R. Co., 105 Mo. 455, 16 S. W. 849; see, also, Deschner v. St. Louis & M. R. Co., 200 Mo. 310, 98 S. W. 737.]

The evidence tends to prove that defendant's testator, Quinn, organized the Exchange Bank of Jackson in 1894, and, besides being the cashier, was the controlling

spirit therein. Plaintiff, a lawyer by profession, purchased some of the stock and became a director in the bank about sixteen months before the purchase of the twenty-two shares of stock from Quinn out of which the present controversy arises. A couple of months before purchasing the twenty-two shares of stock, which was on the 4th day of September, plaintiff was elected vice president of the bank, but his relationship therewith was more nominal than real. At that time he was not familiar with the banking business and relied exclusively on Quinn, the cashier, who had organized the bank and dominated it during the course of its existence. The bank was incorporated with $20,000 capital and its monthly statement prepared by the cashier, Quinn, immediately before, showed it to have $10,000 surplus and $2000 undivided profits, besides being sound and solvent in every respect and its accounts properly balanced. On the statement thus prepared and the showing made by Quinn, its stock was worth on the market $150 per share, the par value of which was originally $100. It appears that Quinn, the cashier, represented these facts to plaintiff and the other parties who purchased the stock from him, and that they, relying on his statements to that effect, purchased the stock as above stated at $150 per share. One month and six days thereafter, it was discovered the bank was short in its accounts $23,550, and it was in that condition at the time plaintiff was induced to purchase the stock from Quinn. At all times Quinn, as cashier, had managed the bank and kept the books and was responsible for the shortage. On this appearing, it appears to have been conceded by Mr. Quinn and all others concerned, that the bank stock purchased by plaintiff was worth only $100 per share, instead of $150, at the time of the purchase. There can be no doubt that these facts entailed liability against the cashier, Quinn, on account of such representations, and this is true even though he did not personally know the condition of the bank

at the time; for where one makes, as of his own know-
ledge, a false representation, not knowing whether it
is true or false, it is a fraud as much as if he knew it to
be false. If one makes false representations as of his
own knowledge and asserts them to be true when, in-
deed, he possessed no knowledge whatever on the sub-
ject, the law then implies the scienter because of the
reckless conduct about such representation and for the
reason that a positive statement of the fact implies
knowledge of such fact. [See Hamlin v. Abell, 120 Mo.
188, 25 S. W. 516; Serrano v. Miller, etc. Commission
Co., 117 Mo. App. 185, 93 S. W. 810.] Furthermore, it
is the rule, too, that where one, because of his peculiar
position, has special means of knowledge, as here, and
makes representations which he ought to have known
to be false, if he did not, the law will imply scienter
against him. In such cases, the law will not permit one
to assert for knowledge what he must have known that
he ought not to even have believed. [Serrano v. Mil-
ler, etc. Commission Co., 117 Mo. App. 185, 197, 93 S.
W. 810; Raley v. Williams, 73 Mo. 310; 1 Bigelow on
Fraud (1888), 509.] But it is argued, though such be
true, plaintiff here is not entitled to recover, for, as a
director of the bank and its vice president, he must be
charged with full knowledge pertaining to its affairs.
That plaintiff possessed no knowledge whatever con-
cerning the shortage in the bank and the depreciated
value of its stock for that reason, seems to be conceded;
but it is said that the law affixed the duty upon him
as director and vice president to know its true condi-
tion and, therefore, he may not be heard to complain
of the cashier who had deceived him. There can be no
doubt as to the responsibility of a director, in certain
circumstances, as to a third party who occupies the re-
lation of creditor to the bank, such as a depositor, but,
obviously, the rule of such cases ought not to apply
here. In the ordinary affairs of life, men enjoy rela-
tions of confidence and one frequently relies upon the

good faith of another. Quinn, the cashier, had organized this bank in 1894 and dominated its affairs during all of the years. He was the cashier, had complete charge of its deposits, its accounts, its books, etc., and it appears plaintiff was more of a nominal officer than real, for he was not acquainted with the books or the accounts, nor was he able to ascertain the true condition of affairs without an extended examination. But it is said he should be precluded of a right of recovery for the reason that he was negligent, as the books and accounts were open to him as an officer of the bank. It is true that neither law nor equity will afford relief for false representations where the subject-matter of dispute is equally known to both parties, and if one trusts to representations not calculated to impose upon a person of ordinary prudence, or neglects means of information within easy reach, he should suffer the consequences. Thus we declared the rule in Bradford v. Wright, 145 Mo. App. 623, 123 S. W. 108. But it cannot be said that these parties were on equal footing or that the condition of the bank and the value of its stock were equally known to both. Instead of the true condition and the means of information being open and obvious, it was concealed through a system of bookkeeping revealed in the evidence as sufficient to mislead such expert accountants as the state bank examiners. This being true, it is not to be doubted that plaintiff had the right to rely upon affirmations of truth made by Quinn; for the law requires only that one shall exercise the care employed by an ordinarily prudent business man and in no sense imposed upon plaintiff the duty to exercise extraordinary diligence toward investigating the condition of the bank. [Brolaski v. Carr, 127 Mo. App. 279, 105 S. W. 284; Hines v. Royce, 127 Mo. App. 718, 106 S. W. 1091; Cottrill v. Krum, 100 Mo. 397, 13 S. W. 753.] Obviously, the principle obtains alike between plaintiff, the vice president of the bank, and Quinn, the cashier, from whom he purchased the stock, for plain-

tiff had a right to rely upon representations of fact
affirmed by Quinn unless the means of information was
equally open to him, which is shown not to be true. The
judgment should be affirmed. It is so ordered. *Caul-
field, J.,* concurs. *Reynolds, P. J.,* deems the opinion
in conflict with that of the Supreme Court in Lieber v.
Lieber, 239 Mo. 1, 143 S. W. 458, and, therefore, dis-
sents. Because of this, he requests the case be certified
to the Supreme Court for final determination, and it is
so ordered.

## DISSENTING OPINION.

REYNOLDS, P. J.—I am unable to agree to the
conclusion arrived at by my learned brother Nortoni
in this case. That disagreement primarily arises out
of our respective understanding of the facts: then to
the application of the 'law to the facts. As I under-
stand the facts they are substantially as follows: One
Hugh R. Quinn, testator of appellant, was cashier of
the Jackson Exchange Bank, a bank organized under
the laws of this state and located at Jackson in Cape
Girardeau county; he was that officer when he died and
had been such since the organization of the bank. The
respondent Snider, and Messrs. Sperling, Schwab, and
Quinn, were stockholders and directors in the bank,
Snider its vice president and then president, Schwab
vice president, Sperling assistant cashier and book-
keeper; all occupying these positions at least in Sep-
tember, 1906, how long before that is not very clear.
Whether there were other directors or who they were
is not in the record. It appears that about Septem-
ber, 1906, Quinn owed the bank, directly or as indorser,
about $29,000; of this $20,000 was as indorser on notes
given by a Mr. English to the bank; about $2700 was as
indorser of a note for about $2700, given by a Mr.
Limbaugh, and some $7000, evidently his own note; in
all about $29,000, for which the bank held paper to

which he was a party. Quinn had taken up these English
notes, borrowing $20,000 from an outside party, but
left with the Exchange Bank his own note for $7000,
and also the Limbaugh note, on which Quinn was in-
dorser. This was the situation about the first of Sep-
tember, 1906.    Quinn then owned the controlling
amount of stock in the bank.   This stock was evidenced
by certificates, among them one for forty and the other
for twenty-five shares.   It appears that Quinn had
talked over the matter of his indebtedness to the bank
with Messrs. Snider, Schwab and Sperling, all four of
them then directors, and Quinn told them he was anx-
ious to take up his own note for $7000 and the Lim-
baugh note, the two totalling about $9700.   He pro-
posed to these three gentlemen that he would sell them
sixty-five shares of his stock, par value $100 per share,
at $150, the book value of the stock apparently being
$160 a share.   This would give him about $9700 cash
with which to take up these two notes.   Quinn told
them that he wanted to pay these notes and straighten
up his indebtedness to the bank.   For that reason and
to accomplish it he asked these three gentlemen, all
then stockholders, to take sixty-five shares of his stock
at $150 per share; offered them that much of his stock
at that figure.   They talked together about the value
of the stock and Quinn said he thought it was worth
$150 a share, although the books showed it to be worth
$160 or more, based on capital or surplus, Quinn say-
ing that the daily statements showed this.   Sperling,
giving this testimony, then testified: "We agreed to
take the stock."   Each of the three spoke for himself,
he testified, while they were all together discussing it.
It was discussed between them at different times and
not finally settled at any one discussion.   In these va-
rious discussions between the parties Quinn repeated
that the reason he wanted to sell the stock was to take
up these personal obligations of his own which the
bank held; that he proposed to apply the proceeds of

the sale to taking these up. "It was not any actual de-
sire to get rid of the stock, I don't think, but to relieve
him of these obligations," said Sperling. There is a
hint in the testimony that all of them were unwilling to
have these personal obligations of Quinn submitted to
the bank examiner. The result of these negotiations
was that Schwab, Snider and Sperling agreed to buy
these sixty-five shares of stock at $150 per share. Sper-
ling testified: "We did not make any agreement as
to the exact number of shares that we would take until
the day that this sale was consummated." The sale
was finally consummated on September 4, 1906, in the
back room of the bank, all four of them being present
and talking it over. Witness was then asked this:
"And you and Mr. Schwab and Mr. Snider agreed to
buy this up?" The witness answered: "In the divi-
sion of the stock, I had two shares I had formerly
bought. I says, 'I will take twenty-three and make
me twenty-five.' And I had bought ten shares from Mr.
English, making thirty-five, so I said, 'I will take
twenty-three shares of it,' and, as well as I remember,
the division was in such a way as to give each pur-
chaser even shares including what he already had.
I don't remember how it figured out with Mr. Snider
and Mr. Schwab, but it figured out thirty-five shares
I would have."

Mr. Sperling was asked, in cross-examination,
when he had purchased sixty-five shares. He answered
that he had not purchased sixty-five shares. He was
then asked how many shares of stock Quinn had de-
livered on September 4th. He answered, "Sixty-five
shares at one time;" that he sold "sixty-five shares on
September 4, 1906." He was asked, "Whom did he
sell that stock to?" He answered, "Mr. Snider bought
twenty-two shares. Mr. Schwab bought twenty shares.
I bought twenty-three shares, and paid $150 a share
for it." As shown by the daily statement book of the

bank the stock was worth about $160 a share; had not paid the book value, because, said the witness, "Mr. Quinn asked $150 for it. . . . We bought it at Mr. Quinn's solicitation for the purpose of taking up obligations he had with the bank and to relieve him of the obligations, which he wanted to wipe out."

It appears by the testimony of this witness that directly after this purchase of the sixty-five shares of stock, to be more accurate, about October 1st, an examination of the affairs of the bank was gone into, and the purchasers found that they had paid more for the stock than it was worth. Whereupon, about October 10, 1906, Snider, in the director's room of the bank, Quinn, Schwab and Sperling present with him, called the matter up and said to Quinn that he had paid more for the stock than it was worth and he thought he was entitled to "remuneration on it," to which Quinn at once agreed. As the witness testified: "Before getting to that, the stock being worth less than par, as the statement showed, Mr. Snider agreed to accept, to take the stock at par, and Mr. Quinn at once agreed that he would return to him fifty dollars a share for each share of stock he had purchased, twenty-two shares." This, said the witness, was in his presence. Snider was talking to Quinn. "It was at a board meeting. Judge Snider was there, Mr. Schwab and myself, and Snider was taking the foremost movement in the affair, and it was in that meeting where we were all four that Mr. Snider brought it up." While this testimony appears to relate to the deal of Mr. Snider for his own stock, it also appears that it covered that of all three of the parties, for, continuing, the witness said that Quinn stated he had not the money and at first proposed to turn over property, "and asked if he would take property for it, Judge Snider for his and the rest of us." Quinn named over the property and gave his estimate of the value. This was declined. The property he offered to each of them at this October

10th meeting is fully described in the statement filed with and made part of the Snider account in the probate court and in evidence in the case, hereafter set out in full.

In redirect examination Mr. Sperling was asked this: "I will get you to state if Mr. Quinn said anything about knowing the condition of the bank to Judge Snider, the books of the bank? A. Well, from the surprise, when the condition was found out, I would take it that he never knew."

Mr. Sperling was also asked if he was not interested in this case in a way. He answered that he had a claim against the estate of Quinn and had presented it in the probate court along with the Snider and Schwab claims, but are trying them separately, but that he has no interest whatever in Mr. Snider's claim, although in some respects the claims are alike; he thought his claim a better one that that of Mr. Snider. The Mr. Snider and Judge Snider mentioned refer to the respondent.

The statement filed in the probate court by respondent Snider, dated July 19, 1908, against the executor of Quinn and being the statement of the cause of action on appeal to the circuit from the probate court, is as follows:

"Jackson, Mo., July 19th, 1909.

Hugh R. Quinn, deceased, S. M. McAtee,
   Executor, to John A. Snider, Dr.,
   1906

September 4th. To amount overpaid for 22
      shares of the capital stock of the Jack-
      son Exchange Bank (see statement filed
      in claim of B. S. Schwab, deceased, by
      B. H. Schwab, executor), ........... $1,100.00
Int. from September 4, 1906, to date 6 per
      cent on same, ......................    179.75

                                           $1,279.75."

No affidavit appears to this.

. The statement filed in the claim of B. S. Schwab, deceased, and called for in the Snider statement as above was introduced in evidence by defendant and is as follows:

"In the Probate Court of Cape Girardeau County, Missouri.—To the adjourned May term, 1909.

"In the matter of the claims of B. S. Schwab, deceased, B. H. Schwab, administrator, Blucher Sperling and John A. Snider, against Hugh R. Quinn, deceased, S. M. McAtee, Executor.

. "Claimants above named state that Hugh R. Quinn, deceased, was on September the 4th, 1906, a large stockholder in the Jackskon Exchange Bank, and the cashier of said bank, which position he had held continuously from its organization in the year 1894, and which position he held at the time of his death.

"That on September 4, 1906, at the special instance, solicitation and request of the said Hugh R. Quinn, and to enable him to pay off and discharge his personal note, amount on said September the 4th, 1906, $7050, together with a note for Limbaugh of $2700.00, to said Jackson Exchange Bank, total $9750; B. S. Schwab, Blucher Sperling and John A. Snider purchased of and from him, the said Hugh R. Quinn, sixty-five shares of the capital stock of said bank, as follows: B. S. Schwab twenty shares at $150 per share, Blucher Sperling twenty-three shares at $150 per share, and John A. Snider twenty-two shares at $150 per share, and paid the said Hugh R. Quinn cash for all of said stock, he, the said Quinn, cashier of said bank, representing the purchase price to be the book value of said stock on September the 4th, 1906.

"That on October the 10th, 1906, the first balance of the individual depositor's account was taken out, after the purchase of said stock, and showed a shortage in said account of $———— dollars, whereupon Hugh R. Quinn, cashier as aforesaid, immediately volunteered

and agreed to return to B. S. Schwab, Blucher Sperling and John A. Snider the sum of $50 per share for each and every share of stock so purchased by them as aforesaid, and having no money on hand, offered to convey to each of them real estate in the city of Jackson as follows: To B. S. Schwab the Greek property; to Blucher Sperling the old Painter place, and to John A. Snider the May place, but John A. Snider, wishing money instead of property, and Hugh R. Quinn having a large claim against the bakrupt estate of the Jackson Brick and Tile Company, which he expected to collect soon, and Mr. Quinn being on several bonds for the bank, he suggested that he would make arrangements to pay the said sums of money, to-wit: to B. S. Schwab $1000; to Blucher Sperling $1150 plus $100 for two shares purchased a short time before, total $1250; and to John A. Snider $1100, as soon as he could do so, not later than he could realize on his claim against the Jackson Brick and Tile Company, bankrupt.

"So the matter has rested, except to be talked about by the parties in interest often, and at meetings of the board of directors of the bank, when Mr. Quinn would inform the parties in interest and the board of directors that he expected a decision soon, by the Federal Court of his claim against the Jackson Brick and Tile Company, a bankrupt, and as soon as his claim was paid he would pay each of the claimants what was due him with interest.

"But for the delay occasioned by litigation in the Federal Court of Mr. Quinn's claim against the Jackson Brick and Tile Company, bankrupt, the matters above referred to would have been fully settled before the sudden sickness and untimely death of Hugh R. Quinn.

"BEN H. SCHWAB, Administrator,
"BLUCHER SPERLING and
"JOHN A. SNIDER,
"By JOHN A. SNIDER, their attorney.

"State of Missouri,      ⎱
"County of Cape Girardeau. ⎰ ss.

"John A. Snider, being duly sworn, upon his oath says, that the matter set out in the above petition is true.

"JOHN A. SNIDER.

"Subscribed and sworn to before me this the 19th day of July, 1909.

"EDWARD D. HAYS, Judge Probate."

From an allowance of the Snider claim in the probate court, the executor of Quinn appealed to the circuit court. In that court this executor filed an answer denying the indebtedness and set up that on the 4th of September, 1906, Mr. Snider was president of the bank, had been director for many years prior to election as president, and knew the book value of the stock and of the twenty-two shares purchased from Quinn and is estopped from denying that he did not know its value; further, that if Quinn did promise to return plaintiff $50 per share, that promise was without consideration.

There was a reply filed to this, admitting that plaintiff was president September 4, 1906, but denies that he had been a director for a long number of years; denies that plaintiff knew the value of the stock except as shown by the daily statement book of the bank and the representations of Quinn as to its value, and charges that while the books showed its value on September 4, 1906, to be $150, and while plaintiff relied on and wholly trusted to Quinn as cashier that its value was $150, that plaintiff had no other knowledge aside from what he had from Quinn and the daily statement. That Quinn offered to sell him twenty-two shares at $150 and he purchased it at that price in good faith, relying solely and explicitly on the representations of Quinn as to its value, and paid Quinn $3300 cash for it. That it later developed that the stock was not worth $150 but less than $100 per share and that Quinn there-

upon, at the request of plaintiff, "and in order to make good his representations as to the value of said stock and to reimburse this plaintiff, promised to repay this plaintiff the sum of fifty dollars per share for all the stock so purchased from him, but plaintiff denies that said amount was ever paid, although often promised by said Quinn." This reply is sworn to by plaintiff.

The only oral testimony given was by Mr. Sperling.

The cause was submitted to the court without a jury and the court found for plaintiff, entering judgment for $1362.90. From this the executor has perfected his appeal, having filed a motion for a new trial and in arrest and saved his exceptions on these being overruled. One of the errors assigned in the motion for a new trial is to the admission of the testimony of the witness Sperling, because he "was a party to the contract, and incompetent as a witness for any purpose, Hugh R. Quinn, the other party to the contract, being dead." This is the principal error relied upon for a reversal.

It has been said by Judge LAMM in his dissenting opinion, in Griffin v. Nicholas, 224 Mo. 275, l. c. 327, 123 S. W. 1063, referring to what is now section 6354, Revised Statutes 1909, "Doubtless no section of our statutes has been oftener here for construction. . . . In the exposition of no section of the statute is there more call for use of the just rule of interpretation that the spirit of the statute as well as its letter must be carefully looked to." These remarks are very apposite to the case now before us.

When Mr. Sperling was offered as a witness and about to be questioned as to the transaction and conversations between himself, Snider, Quinn and Schwab, objection was made to his testifying on the ground that he was under the disability of the statute, Quinn being dead. This objection was interposed at different times and exception saved to the ruling of the court admit-

ting the witness to testify as to the conversations between himself, Quinn and the other parties, all four of them being present at the time, and particularly to the conversation that occurred between them at the time of the transfer of the stock to them by Quinn and to the subsequent conversation between all four of them at the time that the witness testified that Quinn had agreed to refund fifty dollars a share on the stock. It is hardly necessary to say that objection once made and exception saved, the objection need not be repeated. [Salt Lake City v. Smith, 104 Fed. Rep. 457, l. c. 470, and cases there cited.]

It is on the competency of this witness as to these matters that I am obliged to dissent from the conclusion arrived at by my learned associates.

I am of the opinion that on the rulings and holdings of our Supreme Court in the interpretation of section 6354, Revised Statutes 1909, this testimony should not have been admitted.

Without undertaking to go into a recapitulation of the decisions which lead me to this conclusion, I might be satisfied to rely upon the very able exposition of them to be found in the opinion of Judge Woodson, speaking for the court in Banc in Lieber v. Lieber, 239 Mo. 1, filed December 23, 1911, reported unofficially in 143 S. W. 458.

In that case, Judge Woodson, referring to Chapman v. Dougherty, 87 Mo. 617, as overruling Bradley v. West, 68 Mo. 69, says that in Chapman v. Dougherty the court "correctly held that the disability imposed by this statute (now Sec. 6453, R. S. 1909) upon a witness who is one of the original parties to a contract or cause of action in issue and on trial, where the other party thereto is dead, and the survivor is a party to the suit, is coextensive with every occasion where such instrument or cause of action may be called in question." Again, referring to Meier v. Thieman, 90 Mo. 433, 2 S. W. 435, the learned judge calls attention to the fact

that Adolphus Meier, the real party in interest, was not a party to the record, while Alwina Meier, the party to the record, was only nominally interested in the subject-matter of the litigation, and quotes approvingly from the decision in that case as follows: "The statute is in derogation of common law. If both parties to the contract or cause of action are alive, they can testify as other witnesses, . . . but not so if one be dead. The substance of the provision is, that if both parties are alive, both may testify, but if one be dead, then the common law is in full force as to the competency of the survivor as a witness in his own favor. The statute contains no intimation that the 'other party' referred to is necessarily a party to the record. The language of the statute is 'the other party:' i. e., the other original party to the contract or cause of action shall not be admitted to testify in his own favor, where death has precluded the other original party from an equal opportunity. Whether party to the record or not, makes no difference as to the statutory incompetency of the witness. . . . The letter of the statute makes no distinction as to the status of the witness on the record; the rule of his exclusion is as broad as the contract or cause of action in issue and on trial, and his testimony in his own favor."

This I understand to mean the statute is in derogation of the common law in so far as it eliminates interest as a disability and that is true as between the living only. When one of the parties to the transaction, which presupposes an interest by that party in the transaction, whether that interest is direct, derivative or in a representative capacity, as for instance, agency, is dead, then the disability of the common law inheres in all its force as against the party living. It is not accurate to say that this section of the statute, in its entirety, is in derogation of common law; it is so only as between the living.

When the transaction is between agents (Charles.

Green Real Estate Co. v. Building Co., 196 Mo. 358, 93 S. W. 1111; Carroll v. United Railways Co., 157 Mo. App. 247, l. c. 270 *et seq.*, 137 S. W. 303), or between principal and an agent of the other party to the transaction, one of them dying debars the survivors. [Williams v. Edwards, 94 Mo. 447, 7 S. W. 429.]

Here the issue as to the original transaction was whether Quinn had made certain representations as to the condition of the bank and as to redeeming these sixty-five shares of stock; and as to the second step in it, and on which this claim rests, whether Quinn had acknowledged that he had overcharged these parties and had agreed to pay back to them fifty dollars a share on each share purchased by them from him. When the witness Sperling was permitted to testify on these matters, it seems very clear to me that he was testifying in his own favor just as fully as if he was a party of record in this particular action. He, Snider and Schwab were all interested in the purchase in the first instance and then in overturning the sale, or compelling repayment of a portion of the purchase price of these sixty-five shares, notwithstanding the fact that each had purchased his aliquot part of the sixty-five shares out of his own means and on his own account, and each was to receive back fifty dollars per shares on the shares purchased. Quinn was not proposing to sell to any one of them, independent of the other. What all had in mind was to relieve Quinn of liability on his own $7000 note and on the $2700 note of Limbaugh, on which he was indorser. He was not selling out his stock in driblets, but proposed, as a relief to him from these specific obligations, to sell out all of the sixty-five shares; nothing short of that could relieve him from his financial embarrassment and to this purpose all four of them were parties. When Quinn agreed to refund, it was not to Snider alone, but to all three of them, Snider then acting as spokesman and representative of the three. So Sperling testified.

When, therefore, in order to set aside this sale and to recover for Snider fifty dollars a share, Sperling was testifying in this case, he was testifying as distinctly and completely to a transaction to which he was a party as if he was a party to the record. This is true, even conceding that each of these parties purchased the shares of stock which he acquired from Quinn individually and in a sense by individual contract. Notwithstanding that, it appears very clear to me, from an examination of the whole testimony in the case and consideration of the transaction, that it was but one transaction, a transaction in which all three were interested, made and entered into by Judge Snider, Mr. Schwab and Mr. Sperling for the purpose, primarily, of assisting Mr. Quinn in the adjustment of his financial relations with the bank, ultimately, of course, with the idea of profit on the part of these parties; that is, all of them at the time considered that the stock was worth more than they were paying for it and that Mr. Quinn was letting them have these sixty-five shares at less than what he considered it at the time to be worth on account of the financial pressure under which he was laboring. When we consider the facts attendant on the efforts to have Quinn refund, and that is the real foundation of this present claim, according to Sperling, Judge Snider was speaking and acting for all three of them; in fact as their spokesman and representative, all three of the claimants present. It is impossible to read the statement which is in evidence, and which Judge Snider, as attorney for the executor of Mr. Schwab, filed in the probate court, without arriving at the conclusion that this arrangement or alleged promise to refund was a transaction in which all three of the parties who had bought the stock were at the time not only privy but participants. In other words, Snider, Schwab and Sperling, in the first part of the transaction, were all working together to assist their fellow director and officer, Quinn, in his financial troubles.

They all worked together to procure a refund. It will be noticed that in the statement which was filed in the name of John A. Snider, this statement in the claim of Schwab is distinctly referred to; is embodied in Snider's claim. Not going into particulars concerning the transaction in his own statement, Judge Snider saw fit to incorporate in that statement, filed in the probate court, these words: ''See statement filed in claim of B. S. Schwab, deceased, by B. H. Schwab, executor.'' In this latter statement, which is verified by Judge Snider, it is set out that ''on September 4, 1906, at the special instance, solicitation and request of the said Hugh R. Quinn, and to enable him to pay off and discharge his personal note, amount on said September the 4th, 1906, $7050, together with a note for Limbaugh of $2700 to said Jackson Exchange Bank, total $9750; B. S. Schwab, Blucher Sperling and John A. Snider purchased of and from him, the said Hugh R. Quinn, sixty-five shares of the capital stock of said bank, as follows:'' Following this is a statement of the number of shares purchased by Schwab, Sperling and Snider, and then follows this statement: ''and paid the said Hugh R. Quinn cash for all of said stock, he, the said Quinn, cashier of said bank, representing the purchase price to be the book value of said stock on September the 4th, 1906.'' It is then set out that on the 10th of October, 1906, the first balance of the individual depositors' account was taken out and showed a shortage in the account of ———— dollars, ''whereupon Hugh R. Quinn, cashier as aforesaid, immediately volunteered and agreed to return to B. S. Schwab, Blucher Sperling and John A. Snider the sum of fifty dollars per share for each and every share of stock so purchased by them as aforesaid, and having no money on hand, offered to convey to each of them real estate in the city of Jackson as follows,'' describing the real estate. This paper, it will be observed, is signed in the name of the administrator of Schwab and in that of Sperling and of

John A. Snider, "by John A. Snider, their attorney," and is sworn to by Judge Snider.

The claims of all three of these parties are against the estate of Quinn; they all relate to and grow out of the same transaction; all these parties were participants in that transaction; each is dependent on the testimony of the others to establish the transaction and the alleged promise to refund, on the establishment of which latter the claim of each rests.

It is to be noted that this is not an action to rescind the whole transaction, nor to recover the difference between the price at which the stock was sold and its real value. No testimony was given on these lines. Its object is the recovery of fifty dollars per share which it is alleged Quinn had promised to repay to plaintiff and to Sperling and Schwab. When Sperling was testifying he was testifying in favor of a party interested with him in the contract, the cause of the action—in effect—testifying in his own favor, and this he is forbidden to do under the statute, the reason for the rule of which is stated by the text-writers and in many decisions to be, "Where there is no mutuality, there should be no admissibility; when the lips of one party to a contract are closed by death, then the other party shall not be heard as a witness." The witness is to be excluded, not because he is an interested party, for the question of interest is not the determining factor (Weiermueller v. Scullin, 203 Mo. 466, l. c. 473, 101 S. W. 1088), but because the other party to the contract is dead. Summing up the cases, Judge WOODSON, in the Weiermueller case, supra, says, l. c. 472: "This court has many times held that the statute does not exclude the living party from testifying where the evidence relates to transactions and conversations had with others to which the deceased was not a party and with which he had no connection and of which he had no knowledge." Here the conversations testified to were with the deceased cashier, Quinn; had with plain-

tiff and this witness; related to a contract to which every one of them was a party and with which they were all connected.

I cannot believe that within the spirit or intent of our statute, as interpreted by the Supreme Court in many cases, the last Lieber v. Lieber, supra, either one of the survivors should be admitted to testify for any of the others. Death has closed the lips of Quinn: I think the law closes the lips of the others.

With the highest respect for our brothers of the Kansas City Court of Appeals, I think that the view taken by them in Thompson & Thompson v. Brown, 121 Mo. App. 524, 97 S. W. 242, takes too narrow a view of the statute and is not in line with the trend of decisions by our Supreme Court as to the liberal construction to be given that statute.

In the case at bar, I am clearly of the opinion that to allow the admission of the testimony of this witness Sperling as to the transaction to which all were parties and in which all had participated, the very object and purpose of our statute as to disqualification of a witness, the other party to the contract being dead, would be destroyed. The danger of the elimination of, or refusal to apply, the statutory rule in a case of this kind seems to be obvious. We have the case of Sperling testifying for Snider in the latter's case, and then mayhap Sperling and Snider testifying for Schwab, while in Sperling's case, Snider in turn testifying for Sperling. As Schwab is dead his lips of course are closed and his testimony is not available for the other two parties. I cannot believe that in the light of the statute any such course is lawful or can be pursued.

With these facts in this record, it is impossible for me to arrive at any other conclusion than that these parties were all parties to this one contract, and so far such as to render either of them an incompetent witness as to what took place in connection with it or as

to the statements or declarations of Quinn, he being dead at the time of the trial. For these reasons I can come to no other conclusion than that the judgment of the circuit court should be reversed and the cause remanded.

Considering that the conclusion to the contrary, arrived at by my learned and highly esteemed associates, conflicts with the last and controlling decision of the Supreme Court as set out in Lieber v. Lieber, as well as with other decisions of that court hereinbefore noted, I respectfully ask that this cause be certified to the Supreme Court for its determination.